# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Mauricio I. Melendez,

     Petitioner

v.

Brian Williams, et al.,

     Respondents

Case No.: 2:16-cv-01003-JAD-DJA

**Order Denying Habeas Petition and Certificate of Appealability**

[ECF No. 18]

     Nevada state prisoner Mauricio I. Melendez brings this habeas petition to challenge his first-degree-murder conviction for the shooting death of his wife.[1] Melendez claims that his prosecution was plagued by ineffective assistance of counsel and prosecutorial misconduct. But, because I find that Melendez has not shown any basis for habeas relief, I deny the petition, decline a certificate of appeal, and close this case.

## BACKGROUND[2]

     In August 2008, Melendez shot his wife, Chennel, in the forehead while she was sitting at the couple's kitchen table. Melendez admitted to police that he shot and killed Chennel, but he claimed that he did so unintentionally and that he did not know the gun was loaded. The State presented evidence at trial that, rather than immediately calling 911 or seeking other help, Melendez wrapped Chennel's body in a blanket, transported it from the kitchen table to the couch, and cleaned up blood in the kitchen. He also took multiple photographs of Chennel's body in the hours after her death.

---

[1] ECF No. 18.

[2] This background is derived from the exhibits filed under ECF Nos. 19–21 and this court's own docket.

After a five-day trial in the Eighth Judicial District Court, Clark County, Nevada, in July 2009, the jury found Melendez guilty of first-degree murder with the use of a deadly weapon. The court sentenced Melendez to two consecutive terms of life with the possibility of parole after twenty years. Melendez appealed. In July 2011, the Nevada Supreme Court affirmed the conviction. In February 2012, Melendez filed a proper person state habeas petition in the state district court. With the assistance of appointed counsel, he filed several supplemental petitions. The state district court conducted an evidentiary hearing and granted the petition, concluding that Melendez's trial attorneys were ineffective in several respects, but the Nevada Supreme Court reversed the lower court's decision to grant relief.

On May 2, 2016, Melendez filed his proper person federal habeas petition. With the assistance of appointed counsel, he filed a first amended petition on February 24, 2017. On respondents' motion, I dismissed claim 1E of the first amended petition as unexhausted on February 20, 2018, and Melendez then opted to abandon that claim. I now consider Melendez's remaining claims on their merits.

## STANDARDS OF REVIEW

**A. Legal standards**

If a state court has adjudicated a habeas corpus claim on its merits, a federal district court may only grant habeas relief with respect to that claim if the state court's adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."[3] A state court acts contrary to clearly established federal law if it

---

[3] 28 U.S.C. § 2254(d).

applies a rule contradicting the relevant holdings or reaches a different conclusion on materially indistinguishable facts.[4]  And a state court unreasonably applies clearly established federal law if it engages in an objectively unreasonable application of the correct governing legal rule to the facts at hand.[5]  Section 2254 does not, however, "require state courts to *extend*" Supreme Court precedent "to a new context where it should apply" or "license federal courts to treat the failure to do so as error."[6]  The "objectively unreasonable" standard is difficult to satisfy;[7] "even 'clear error' will not suffice."[8]

Habeas relief may only be granted if "there is no possibility [that] fairminded jurists could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."[9]  As "a condition for obtaining habeas relief," a petitioner must show that the state-court decision "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement."[10]  "[S]o long as 'fairminded jurists could disagree' on the correctness of the state court's decision," habeas relief under Section 2254(d) is precluded.[11]  The Antiterrorism and Effective Death Penalty Act (AEDPA) "thus

---

[4] *Price v. Vincent*, 538 U.S. 634, 640 (2003).

[5] *White v. Woodall*, 134 S. Ct. 1697, 1705–07 (2014).

[6] *White*, 134 S. Ct. 1705–06.

[7] *Metrish v. Lancaster*, 569 U.S. 351, 357–58 (2013).

[8] *Wood v. McDonald*, 135 S. Ct. 1372, 1376 (2015) (per curiam) (citation omitted); *see also Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question . . . is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold.").

[9] *Harrington v. Richter*, 562 U.S. 86, 102 (2011).

[10] *Id.* at 103.

[11] *Id.* at 101.

imposes a 'highly deferential standard for evaluating state-court ruling,' . . . and 'demands that state-court decisions be given the benefit of the doubt.'"[12]

If a federal district court finds that the state court committed an error under § 2254, the district court must then review the claim de novo.[13] The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief,[14] but state-court factual findings are presumed correct unless rebutted by clear and convincing evidence.[15]

## DISCUSSION

**A.      Ground one: ineffective assistance of counsel**

The claims in Ground One are all premised on allegations that Melendez was deprived of his constitutional right to effective assistance of counsel. To demonstrate ineffective assistance of counsel in violation of the Sixth and Fourteenth Amendments, a convicted defendant must show that (1) counsel's representation fell below an objective standard of reasonableness under prevailing professional norms in light of all the circumstances of the particular case; and (2) it is reasonably probable that, but for counsel's errors, the result of the proceeding would have been different.[16] Melendez contends that his attorneys violated his constitutional right to effective counsel in four separate—and compounding—ways.

---

[12] *Renico v. Lett*, 559 U.S. 766, 773 (2010) (citations omitted).

[13] *Frantz v. Hazey*, 533 F.3d 724, 735 (9th Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by considering de novo the constitutional issues raised.").

[14] *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011).

[15] 28 U.S.C. § 2254(e)(1).

[16] *Strickland v. Washington*, 466 U.S. 668, 687–94 (1984).

## 1. *Claim 1A: failure to object to the State's substituted coroner*

In Ground 1A, Melendez alleges that he was deprived of effective assistance of counsel because his trial counsel stipulated to the admission of an autopsy report prepared by a coroner who did not testify at trial and allowed the State to present the testimony of a different coroner. Chennel's autopsy was conducted by Dr. Jacqueline Benjamin, who prepared a report of her findings.[17] But, at trial, the State called Dr. Lary Simms to testify about the report.[18] Defense counsel consented to allow Simms to testify in place of Benjamin, who was no longer employed by the Clark County Coroner's Office, and stipulated to the admission of the autopsy report and x-rays.[19] Simms testified about the location of the bullet entrance wound (the forehead, just to the right of the midline and four inches from the crown the head) and the presence of stippling around the wound.[20] He also testified about the trajectory of the bullet, indicating that "it was front to back, … right to left, and … downward."[21] According to the autopsy report and Simms's testimony, the manner of death was homicide.[22]

Melendez contends that he had a Sixth Amendment right to confront Dr. Benjamin at trial absent a showing that she was unavailable to testify and that he had a prior opportunity to cross-examine her.[23] He relies on *Melendez-Diaz v. Mississippi*, in which the Supreme Court held that certificates of laboratory analysts stating that material found in petitioner's possession was

---

[17] ECF No. 19-28.

[18] ECF No. 19-26 at 70.

[19] *Id*. at 70, 74.

[20] ECF No. 19-26 at 80–84.

[21] *Id*. at 87.

[22] *Id*. at 90; ECF No. 19-28 at 2.

[23] ECF No. 18 at 10.

cocaine of a certain quantity were testimonial statements under *Crawford v. Washington*.[24] *Crawford* holds that a witness's testimony against a defendant is inadmissible unless the witness appears at trial or, if the witness is unavailable, the defendant had a prior opportunity for cross-examination.[25] Melendez further alleges that there is a reasonable probability that the outcome of the trial would have been different but for Simms's testimony.[26]

At the evidentiary hearing on Melendez's state post-conviction petition, lead defense counsel, Christy Craig, testified that she was aware of the holdings in *Crawford* and *Melendez-Diaz*,[27] that she did not know why Benjamin was not available and did not have the autopsy independently reviewed,[28] and that defense counsel made a conscious decision "after some discussion" to stipulate to the admission of the report.[29] Their reasoning was that the autopsy report did not impact their defense, which acknowledged that Melendez shot Chennel in the forehead but claimed it was an accident.[30] According to her testimony, the defense saw no downside to stipulating to the report and felt that Simms was an expert who was less likely to "wander about."[31]

---

[24] *Crawford v. Washington*, 541 U.S. 36 (2004).

[25] *Crawford*, 541 U.S. at 54.

[26] *Id*. at 11.

[27] ECF No. 21-9 at 110–11.

[28] *Id*. at 112–15.

[29] *Id*. at 116.

[30] *Id*. at 117.

[31] *Id*. at 117–18.

The state district court granted relief on this claim[32] but the Nevada Supreme Court reversed that decision on appeal.[33]  The state supreme court identified *Strickland v. Washington* as the governing federal-law standard then found that the district court erred by failing to give sufficient deference to defense counsel's decision and in finding prejudice:

> [T]he State contends that the district court erred by concluding that counsel were ineffective for stipulating to the admission of a non-testifying medical examiner's autopsy report and allowing a different medical examiner to testify in his place.  We agree.  At the evidentiary hearing, one of Melendez's trial attorneys testified that she made a strategic decision to stipulate to admission of the report, and the testimony of Dr. Lary Simms, because she did not dispute the findings in the report and she preferred to have Dr. Simms testify rather than the report's author.  The district court failed to give sufficient deference to this decision.  *See Strickland*, 466 U.S. at 689; *Lara v. State*, 120 Nev. 177, 180, 87 P.3d 528, 530 (2004) (explaining that "trial counsel's strategic or tactical decisions will be virtually unchallengeable absent extraordinary circumstances" (internal quotation marks omitted)).  The district court also erred when it determined that Melendez was prejudiced, because although the autopsy report stated that the cause of death was a homicide, the defense's own theory of the case was that the cause of death was a homicide—just an unintentional or accidental homicide.  *See* Black's Law Dictionary 332 (3d ed.1996) (defining homicide).  This distinction was explained to the jury on numerous occasions.  Finally, Melendez failed to demonstrate that the result of trial would have been different had counsel refused to stipulate to the report and insisted upon cross-examining the report's author.  We therefore conclude that the district court erred by granting relief on this claim.[34]

Reviewed under § 2254(d), the state court's adjudication of the claim did not "result[] in a decision that was contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," nor did it "result[] in a

---

[32] ECF No. 21-13 at 9–10.

[33] *State v. Melendez*, No. 65479, 2015 WL 6163908, at *1 (Nev. Oct. 16, 2015).

[34] *Id.*

7

decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The applied the correct federal-law standards and did so in a reasonable manner. In an interview with police the day following the shooting, Melendez admitted to the police that he shot Chennel.[35] The defense that Melendez's counsel presented at trial was that Melendez shot his wife but did so unintentionally.[36] Simms's testimony that Chennel's death was the result of a homicide was not harmful to the defense's case because, as the Nevada Supreme Court noted, classifying a death as a homicide does not speak to the issue of intent. At no point in his testimony did Simms suggest that the shooting was intentional; in fact, he conceded on cross-examination that he was incapable of addressing the issue of intent.[37] Instead, the gist of his testimony was that Chennel's death was a homicide as opposed to a suicide.

Melendez argues that Simms's testimony regarding the trajectory of the bullet allowed the State to advance the theory that Melendez shot Chennel as he stood over her.[38] But defense counsel effectively cross-examined Simms on this point, getting him to admit that he could not say whether the shot was fired from above or below because he did not know how Chennel's head was positioned when she was shot.[39] In addition, Simms's testimony ruling out suicide was based primarily on a photograph showing stippling around the entrance wound.[40] Likewise, his conclusions about the trajectory of the bullet appear to have been based on x-rays of Chennel's

---

[35] ECF No. 20-1 at 50–53.

[36] ECF No. 19-25 at 86–91.

[37] ECF No. 19-26 at 90–91.

[38] ECF No. 39 at 14.

[39] ECF No. 19-26 at 97.

[40] *Id.* at 83–84.

head.[41]  So, rather than simply recounting Benjamin's autopsy-report conclusions, Simms

offered his own knowledge and expertise based on non-testimonial record evidence and was

subject to cross-examination on those points.  It is unlikely defense counsel could have prevented

that testimony on Confrontation Clause grounds.[42]

Lastly, the Nevada Supreme Court properly granted deference to defense counsel's

strategic decision to stipulate to the autopsy report.  *Strickland* recognizes that the strategic

choices that attorneys make on how to defend a case are "virtually unchallengeable."[43]  In

defending her team's decision to stipulate to the autopsy report, Craig testified that Simms's

opinions didn't impact the defense:

> The bullet wound to her head and the stippling were there whether
> we stipulated to the report or didn't stipulate to the report.  It didn't
> change our argument, it didn't change our defense.  We were
> acknowledging that he shot her in the head.  We were arguing that
> it was an accident as a result of mishandling the weapon after they
> both had been drinking.[44]

Plus, Craig was apparently familiar with Simms and felt that cross-examining him would be

more beneficial than potentially cross-examining Benjamin.[45]  Perhaps counsel should have

inquired into why Benjamin was not available, but in light of their strategic analysis, it cannot be

---

[41] *Id*. at 85–88.

[42] *See Altes v. Pennywell*, No. 13-CV-04522-YGR, 2015 WL 3430315, at *9 (N.D. Cal. May 28, 2015) (finding no Confrontation Clause violation where pathologist who did not conduct autopsy testified based on photos showing victim's injuries and the bullet entry point).

[43] *Strickland*, 466 U.S. at 690.

[44] ECF No. 21-9 at 116–17.

[45] *Id*. at 118–19.

said that counsel's decision to stipulate to the report was "outside the wide range of professionally competent assistance."[46]  So, Ground 1A is denied.

### 2. Ground 1B: failure to investigate and prepare for witness Claudine Eggleston

In Ground 1B, Melendez alleges that he was deprived of effective assistance of counsel because his trial counsel failed to adequately investigate and prepare for the testimony of Chennel's sister, Claudine Eggleston.  Eggleston testified that Chennel was unhappy in her marriage but was afraid to leave Melendez because she was afraid he would take their son away.[47]  Eggleston also testified that there were occasions when she tried to contact Chennel by phone but Melendez would answer and refuse to let Eggleston speak to her.[48]

Upon first calling Eggleston as a witness, the State elicited testimony about her having turned over Melendez's computer and camera to the police.[49]  When the State began to inquire about conversations that Eggleston had with Chennel, defense counsel interrupted and requested a bench conference, at the conclusion of which, the court asked Eggleston to return the following afternoon.[50]

Before Eggleston's testimony resumed, the parties argued to the trial judge about allowing Eggleston to testify about what Chennel had told her, with defense counsel objecting based on hearsay and relevance grounds and lack of notice.[51]  Defense counsel also explained to

---

[46] *Strickland*, 466 U.S. at 690.

[47] ECF No. 19-32 at 25–27.

[48] *Id*. at 27–28.

[49] ECF No. 19-26 at 126.

[50] *Id*. at 126–27.

[51] ECF No. 19-32 at 4–16.

the judge that Eggleston had refused to interview with them.[52]  The prosecutor claimed that he had only learned about Chennel's statements to Eggleston a few days earlier at a pre-trial conference.[53]  He also claimed that he notified defense counsel by email about this revelation, but defense counsel denied having received such an email, and the email was never produced at trial or in post-conviction proceedings.[54]

The trial judge decided to allow Eggleston's testimony about her conversations with Chennel, over defense counsel's objections.[55]  He also denied defense counsel's request for a limiting instruction.[56]  On cross-examination, defense counsel attempted to impeach Eggleston by getting her to admit that she had rejected defense counsel's attempts to interview her.[57] Eggleston denied that was the case and stated that she had returned defense counsel's telephone call.[58]

In his petition, Melendez points out that defense counsel had told the jury in opening statements that the State would not present any evidence of a motive for Melendez to murder Chennel.[59]  He alleges that counsel was ineffective for not using an investigator to contact Eggleston, which would have provided the defense with a witness to testify about Eggleston's refusal to cooperate.[60]  He also alleges that effective counsel would have filed a motion with the

---

[52] *Id*. at 6.

[53] *Id*. at 6–7.

[54] *Id*. at 12–13; ECF No. 21-1 at 12–13; ECF No. 21-9 at 173–74.

[55] ECF No. 19-32 at 14–16.

[56] *Id*.

[57] *Id*. at 30.

[58] *Id*.

[59] ECF No. 18 at 12.

[60] *Id*. at 13.

trial court asking that Eggleston be made available to the defense.[61]  He further contends that

Eggleston's testimony likely changed the outcome of the trial because it was the State's only

evidence of motive.[62]

At the state post-conviction evidentiary hearing, Craig testified about the events

surrounding Eggleston.  She recounted that defense counsel were "totally blindsided" by

Eggleston's testimony about Chennel's statements to her.[63]  Going into trial, their understanding

was that Eggleston was going to testify about providing the police with Melendez's camera and

computer, and they had no reason to suspect Eggleston's testimony about what Chennel had told

her.[64]  When she testified about returning Craig's phone call, Eggleston was referring to a

separate occasion when Craig had contacted her about interviewing Melendez's son, who had

been placed in Eggleston's custody.[65]  Craig had contacted Eggleston again to talk about

Chennel and that's when Eggleston refused to cooperate with her.[66]  Craig had no strategic

reason for not using an investigator to contact Eggleston.[67]  In retrospect, with the knowledge of

Eggleston's testimony about Chennel, Craig would have sought an order from the trial court

requiring Eggleston to talk to defense counsel.[68]

---

[61] *Id.*

[62] *Id.*

[63] ECF No. 21-9 at 55.

[64] *Id.* at 55, 169–75.

[65] *Id.* at 57, 59, 170.

[66] *Id.* at 59–61, 171.

[67] *Id.* at 63.

[68] *Id.* at 173–74.

The state district court granted relief on Melendez's claim that counsel was ineffective in their preparation for Eggleston's testimony.[69] But the Nevada Supreme Court reversed that decision, too, concluding that Eggleston's testimony was inconsequential:

> [T]he State contends that the district court erred by concluding that counsel were ineffective for failing to investigate Claudine Eggelston [sic], Melendez's sister-in-law, using the services of an investigator. We agree. The district court offered several rationales for how this conduct was ineffective, but they all rest upon the faulty assumption that Eggelston's [sic] testimony was vital to the State's case. As we concluded on Melendez's direct appeal, we do not believe that Eggleston's testimony contributed to the verdict in any appreciable way in the light of the other evidence presented at trial. *Melendez v. State*, Docket No. 54770 (Order of Affirmance, July 29, 2011). Our review of the record makes clear that it was Melendez's statements to police and his actions after the shooting which were responsible for his conviction, and therefore better preparation for Eggelston's [sic] testimony or highlighting her bias would not have changed the result at trial. We therefore conclude that the district court erred by granting relief on this claim.[70]

Reviewed under § 2254(d), the state court's adjudication of the claim did not "result[] in a decision that was contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," nor did it "result[] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." The Nevada Supreme Court's conclusion that Melendez was not prejudiced by Eggleston's testimony is questionable, but not unreasonable. Also, given the trial judge's ruling, the testimony at issue would still have been admitted even if trial counsel had taken the steps Melendez proposes (obtained a court order or used an

---

[69] ECF No. 21-13 at 12–14.

[70] *Melendez*, 2015 WL 6163908, at *2.

investigator). At most, defense counsel might have been able to more effectively cross-examine Eggleston, but even that conclusion requires mainly speculation.

In addition, while the Nevada Supreme Court's analysis focused on the prejudice prong of the *Strickland* test, I further conclude upon de novo review that Melendez cannot satisfy the test's performance prong either.[71] In preparing for trial, defense counsel reasonably assumed that Eggleston would be testifying about providing the police with Melendez's camera and computer, both of which were a source of evidence presented by the State at trial. Indeed, that appears to have been the State's intention up until just a few days before it called Eggleston as a witness. The record supports a finding that Eggleston's testimony about her conversations with Chennel was a surprise sprung on defense counsel in the middle of the direct examination. Left to scramble, defense counsel objected and argued vigorously that the testimony should be excluded. Ultimately, the Nevada Supreme Court agreed, but concluded the error was harmless.[72]

In addition, defense counsel called Melendez's ex-wife as a witness to testify that Melendez was amicable about their divorce and child custody even though the reason for the divorce was her infidelity.[73] It is only with the benefit of hindsight that Melendez can fault counsel for not conducting a more thorough investigation of Eggleston. *Strickland* does not allow this court to review counsel's performance in that manner.[74] Ground 1B is denied.

---

[71] *See Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam) ("Because the state court did not decide whether Porter's counsel was deficient, we review this element of Porter's *Strickland* claim de novo.").

[72] *Melendez v. State*, No. 54770, 2011 WL 3298525, at *6–7 (Nev. July 29, 2011).

[73] ECF No. 20 at 91–93.

[74] *See Strickland*, 466 U.S. at 689 ("A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the

### 3. *Ground 1C: failure to hire a forensic or other qualified expert about the shooting*

In Ground 1C, Melendez alleges that he was deprived of effective assistance of counsel because his trial counsel failed to consult any forensic experts or call any such experts to testify at trial. In addition to Simms's testimony about bullet trajectory, the State called Angel Moses, a firearms expert who testified that the gun was discharged 1–18 inches away from Chennel's head and required 3 ½ to 3 ¾ pounds of pressure to fire in the cocked position, which he equated to the weight of a half-gallon of milk.[75] Moses further testified that if the gun was not cocked, it would require 12 ½ to 13 pounds of pressure to fire.[76]

In closing argument, the prosecutor relied on Moses's testimony, as well as Simms's trajectory testimony, to argue that Melendez intentionally shot Chennel.[77] The prosecutor also used Moses's and Simms's testimony to recreate the shooting for the jury.[78] According to Melendez, defense counsel were ineffective by not challenging this testimony with defense-hired experts, who could have provided evidence that the shooting was accidental.

At the state post-conviction evidentiary hearing, Melendez presented a report from a forensic scientist, George Schiro, in which Schiro stated that he could have offered theories alternative to homicide:

> I would have been able to demonstrate that, based on the physical evidence, alternative hypotheses, such as an accident or suicide

---

circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.").

[75] ECF No. 19-26 at 106, 111, 115.

[76] *Id.*

[77] ECF No. 20 at 117–18.

[78] *Id.* at 173–75.

were just as likely or more likely than an intentional homicide. While murder cannot be ruled out, there is evidence that is more indicative of an accidental shooting or suicide.[79]

Schiro cited the following factors as support for this position: (1) the lack of searing, soot, or gunpowder tattooing on Chennel Melendez's hands, which would be consistent with her hands being up in a defensive position; (2) the lack of any injuries indicative of a fight or altercation between Mr. and Mrs. Melendez; (3) the apartment was not in disarray and nothing was broken; (4) the angle of the bullet trajectory; and (5) the trigger pull on the gun, which had been mischaracterized by the State.[80] As to the last point, the report stated that, if cocked, the gun required "only a slight amount of pressure" to fire.[81] The state court sustained the State's objection to the admission of the report on hearsay grounds but cited to it in its decision granting relief.[82]

When the report was presented, Craig testified that she was familiar with Mr. Schiro and that she had used his services several times in the past.[83] Craig testified that she did not hire an expert to testify about distance because, due to the stippling, she already knew that the gun was about eighteen inches away.[84] She also testified that the defense did not hire a forensic expert because "tactically" the defense "agreed with the State with regard to the autopsy, the location of the wound, [and] the stippling."[85] She further indicated that the defense's version of the

---

[79] ECF No. 21-12 at 2–3.

[80] *Id*. at 3–4.

[81] *Id*.

[82] ECF No. 21-9, 102; ECF No. 21-13 at 11–12,

[83] ECF No. 21-9 at 102.

[84] *Id*. at 126.

[85] *Id*. at 138–39.

shooting did not differ from the State's, other than to claim that it was a "drunken accident" rather than an intentional act and that she was "not aware or had not considered the idea that there would be some expert that we could call that would be able to say that it was an accident."[86]  With respect to having the gun independently tested by a firearms expert, Craig testified that she had no reason to think that the gun was prone to misfire and, because they were not arguing that Melendez did not pull the trigger, the force required to do so did not matter.[87]  When pressed further on this point, Craig agreed that demonstrating the trigger required less pressure to pull may have weighed in favor proving the shooting was accidental, but not "enough to have somebody come in and testify about that."[88]  For her, the more important point for their defense was providing an "explanation for why he had the gun in his hand in the first place."[89]

The state district court granted relief on Melendez's claim that counsel was ineffective by not consulting with a forensic expert,[90] but the Nevada Supreme Court reversed that decision,[91] concluding that the district court failed to give the *Strickland*-required deference to trial counsel's strategy and that Melendez did not demonstrate prejudice:

> [T]he State contends that the district court erred by concluding that counsel were ineffective for failing to hire an expert to support the theory of defense.  We agree.  Counsel explained that the only issue in this case was whether Melendez intended to kill his wife and she did not believe an expert could assist the jury with this issue.  Counsel chose to make Melendez the focus of the case rather than quibble with the physical evidence because she believed the jurors would sympathize with Melendez when they heard about his life.  The district court failed to give sufficient

---

[86] *Id.*

[87] *Id.* at 177–78.

[88] *Id.* at 182–83.

[89] *Id.* at 183–85.

[90] ECF No. 21-13 at 10–12.

[91] *Melendez*, 2015 WL 6163908, at *1.

deference to this strategy.  But even assuming that counsel's strategy was objectively unreasonable, Melendez failed to demonstrate prejudice.  Melendez did not demonstrate how testimony about a different bullet trajectory or lighter trigger-pull would have made the defense's theory of the case more plausible, or how those facts would lead to a different result at trial given his own admissions and his conduct after the shooting.  We therefore conclude that the district court erred by granting relief on this claim.[92]

Reviewed under § 2254(d), the state court's adjudication of the claim did not "result[] in a decision that was contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," nor did it "result[] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  Neither Simms nor Moses testified that the shooting was intentional.  Instead, the State pulled facts from their testimony to make a case for specific intent.  Schiro's report does not dispute Simms's testimony on trajectory, but instead makes the point that the downward angle could be explained by the tilting of Chennel's head.[93]  Defense counsel elicited the same point when he cross-examined Simms at trial.[94]  Also, Schiro did not test the gun that Melendez used to shoot Chennel,[95] so his report does not demonstrate that Moses's testimony regarding distance or trigger pull was inaccurate.

If the defense had attempted to show that the gun, if cocked, required "only a slight amount of pressure" to fire, as Schiro claimed, they would also need to explain why Melendez had committed the clearly intentional act of cocking the gun in the first place.  Also, a defense premised on the gun accidentally discharging due to a "hair trigger" was not consistent with

---

[92] *Id.*

[93] ECF No. 21-12 at 3.

[94] ECF No. 19-26 at 97.

[95] ECF No. 21-12 at 4–5.

Melendez's statements to the police, which were admitted as evidence at trial.[96]  A more

plausible defense theory was that Melendez pulled the trigger, which he admitted, but thought

the gun was unloaded.[97]  In any case, Melendez has not shown that the presentation of Schiro's

report to the jury would have improved his chances at trial.

Because the state court's decision was not an unreasonable application of either the

performance or the prejudice standard under *Strickland*, this court must deny relief on this

claim.[98]  Ground 1C is denied.

### 4. *Ground 1D: failure to obtain Melendez's consent before conceding guilt to manslaughter*

In Ground 1D, Melendez alleges that he was deprived of effective assistance of counsel

because his trial counsel, Scott Coffee, asked the jury to convict him of manslaughter.

According to Melendez, this was a "radical departure from the defense theory of the case, which

was that the shooting was accidental."[99]  In relation to this claim, Melendez notes that "[a]

criminal defendant has the 'ultimate authority' to determine whether to plead guilty and an

attorney 'must both consult with the defendant and obtain consent' before pursuing any such

course of action."[100]  In the course discussing the jury instructions in his closing argument,

Coffee stated:

> Accident.  There is an instruction on accident in this chance [sic].
> Like a legal example is, I'm swinging an axe and the handle flies

---

[96] ECF No. 19-32 at 131; ECF No. 20 at 22; ECF No. 20-1 at 46–53.

[97] ECF No. 20 at 135–39, 148–49.

[98] *See Richter v. Harrington*, 643 F.3d 1238, 1240 (9th Cir. 2011) (denying petitioner's claim his lawyer should have had a gun expert testify at his murder trial because state court's rejection of the claim was not an unreasonable application of *Strickland*).

[99] ECF No. 18 at 17.

[100] *Id*. (citing *Florida v. Nixon*, 543 U.S. 175, 187 (2004)).

off and somebody gets killed, complete accident.  You're within
your power to find that here.  Wouldn't expect you to find that
here.[101]

Then, at the end of his argument, defense counsel focused on the State's failure to prove malice,

the element that distinguishes murder from manslaughter, and concluded by asking the jury to

consider manslaughter:

> Look at everything, Take it as a whole.  Use the eyeglass of
> character. When you do this you punish him, voluntary [sic]
> manslaughter.  It makes perfect sense, it fits, it is the right
> verdict.[102]

At the state post-conviction evidentiary hearing, Coffee testified that he had no recollection of

obtaining Melendez's consent before conceding to involuntary manslaughter in his closing

argument.[103]  Melendez testified that he did not give his consent.[104]

The state district court granted relief on Melendez's claim that counsel was ineffective by

conceding Melendez's guilt without consulting with him.[105]  On appeal, however, the Nevada

Supreme Court reversed that decision,[106] reasoning that the district court relied on an incorrect

determination of the facts and that *Strickland* was not satisfied:

> [T]he State contends that the district court erred by concluding that
> trial counsel were ineffective for conceding guilt to involuntarily
> manslaughter during closing argument.  *See Armenta–Carpio v.
> State*, 129 Nev. Adv. Op. 54, 306 P.3d 395 (2013) (applying a
> *Strickland* analysis to ineffective-assistance claims based upon a

---

[101] ECF No. 20 at 150.

[102] *Id*. at 152.  Voluntary manslaughter was not among the verdicts available to the jury.
Melendez was charged with, and the jury was instructed on, involuntary manslaughter, defined at
Nev. Rev. Stat. § 200.070.  *See* ECF No. 19-36 at 16; ECF No. 20-3.

[103] ECF No. 21-9 at 192.

[104] *Id*. at 197.

[105] ECF No. 21-13 at 8–9.

[106] *Melendez*, 2015 WL 6163908, at *2.

concession of guilt).  We agree for several reasons.  First, the district court based its decision on an incorrect determination of the facts—Melendez never testified at trial and therefore counsel's concession could not have undermined his trial testimony.  Second, the concession did not directly contradict what counsel told the jury in opening statements.  Third, counsel's decision was not objectively unreasonable under the circumstances.  We therefore conclude that the district court erred by granting relief on this claim.[107]

Reviewed under § 2254(d), the state court's adjudication of the claim did not "result[] in a decision that was contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," nor did it "result[] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  In *Florida v. Nixon*, the Supreme Court held that, because the defendant had otherwise "retained rights accorded a defendant in a criminal trial," defense counsel's effectiveness in failing to obtain his client's consent before conceding guilt in a capital case should be assessed under *Strickland*, not *United States*,[108] which calls for a presumption of prejudice when counsel has "entirely failed to function as the client's advocate."[109]  The Ninth Circuit applied the *Nixon* holding in a non-capital case where defendant's counsel conceded defendant's guilt as to robbery in order to "enhance his credibility on counts where the evidence was somewhat less clear and the penalties significantly greater."[110]

The evidence presented at Melendez's trial left little, if any, doubt that Melendez pointed a gun at Chennel, an unlawful act under Nevada law,[111] and in the process of doing so shot and

---

[107] *Id.* (footnote omitted).

[108] *United States v. Cronic*, 466 U.S. 648 (1984).

[109] *Nixon*, 543 U.S. 175, 188–90.

[110] *See United States v. Thomas*, 417 F.3d 1053, 1058–59 (9th Cir. 2005).

[111] *See* Nev. Rev. Stat. § 202.290.

21

killed her.  Based on that alone, the State had established the elements of involuntary

manslaughter.[112]  Under the circumstances, Coffee made a strategically sound decision to argue

in his closing statement that the correct verdict was manslaughter, not murder.

In *Hovey v. Ayers*,[113] counsel told the jury in closing argument that "there could be

findings . . . of willful, deliberate and premeditated [murder]."  The Ninth Circuit found that this

"argument did not amount to deficient representation" in light of then-recent Supreme Court

decisions:

> In *Yarborough v. Gentry*, for example, the Court counseled that
> defense attorneys often must make strategic decisions as to what
> arguments to include in closing arguments and may choose to
> acknowledge the "shortcomings" of their client's case in order to
> build credibility with the jury.  In *Bell* [*v.Cone*], the Supreme Court
> approved of a strategic decision by counsel to waive closing
> argument altogether, to prevent the prosecutor from having an
> opportunity at a rebuttal closing.  And in *Florida v. Nixon*, the
> Court stated that when facing the distinct possibility of a penalty
> phase, it can be reasonable for defense counsel to concede guilt in
> a guilt-phase closing argument in an attempt to "impress the jury
> with his candor," for purposes of building on that impression
> during the penalty phase.[114]

Compared to defense counsel's comments in *Hovey*, Coffee's comments asking the jury to return

a verdict of manslaughter rather than murder were eminently reasonable.  And given that the jury

found Melendez guilty of first-degree murder, Melendez cannot show that he was prejudiced by

Coffee's remarks.  I must therefore defer to the Nevada Supreme Court's determination that

Melendez was not deprived of effective assistance of counsel.  Ground 1D is denied.

---

[112] *See* Nev. Rev. Stat. § 200.070 ("[I]nvoluntary manslaughter is the killing of a human being, without any intent to do so, in the commission of an unlawful act….").

[113] *Hovey v. Ayers*, 458 F.3d 892 (9th Cir. 2006).

[114] *Hovey*, 458 F.3d at 906 (internal citations omitted).

*5.* ***Claim 1F: cumulative error***

In Claim 1F, Melendez alleges that he is entitled to relief due to the cumulative impact of counsel's errors and omissions. The state district court granted Melendez relief on this theory, but the Nevada Supreme Court reversed that decision.[115] Because Melendez's claims of ineffective assistance of counsel are without merit, the Nevada Supreme Court's rejection of Melendez's cumulative error claim was not unreasonable. So, claim 1F is denied.

**B.** **Ground Two: prosecutorial misconduct**

In Ground Two, Melendez claims that prosecutorial misconduct at his trial deprived him of his right to due process under the Fifth and Fourteenth Amendments. As support for this claim, he alleges that the State elicited testimony from police detective Stephen Popp that the detective did not believe Melendez was telling the truth during his interview with the police. He also points to the State's closing argument wherein, according to Melendez, the prosecutor engaged in misconduct by repeatedly calling him a liar.

With respect to the prosecution's questioning of Popp, Melendez points to the following exchange:

> Question: Now, a couple of times during the interview with Defendant Mr. Melendez, you said things like: We believe you but you just need to tell us the truth, and one of the detectives even led him and said: You know, this was an accident, and the defendant said yes.
>
> Did you, in fact, believe he was telling the truth, or was that kind of an interview technique?
>
> Mr. Coffee: Objection. Calls for him to comment on whether or not he's telling the truth. If he wants to ask interview technique, that's fine, but the detective

---

[115] *Melendez*, 2015 WL 6163908, at *2 n.2.

|   |   |
|---|---|
| | shouldn't comment as to whether he believes the defendant. |
| The court: | Are you asking the detective what he meant when he said those things? |
| Mr. Smith: | Yes. That's the gist of my question. |
| The court: | In that context I'll allow the question. |
| The witness: | It was part of the technique I was using to interview him.[116] |

. . .

| | |
|---|---|
| Question: | Can you tell us what a selective memory is? |
| Answer: | A selective memory, or the term selective memory is just one that we use in which we believe somebody is selectively giving us information based on what they're willing to tell us, or what they want us to hear. It's not the complete truth, it's just bits and pieces. |
| | If you recall back to the statement – |
| Mr. Coffee: | Permission to approach, Judge? |
| The Court: | Yes, come forward. |

(Whereupon, counsel conferred with the Court.)

| | |
|---|---|
| The Court: | Proceed, please? |
| Mr. Smith: | Thank you. |
| Answer [sic] (By Mr. Smith): | Detective, suffice it to say, a person who, in your opinion, is utilizing selective memory is recalling certain things that may help them, but not recalling other things that may hurt them? |
| Answer: | Yes. |
| Question: | Did you think that Mr. Melendez was employing such a technique? |

---

[116] ECF No. 18 at 21–22 (quoting ECF No. 20 at 23).

Answer:        Absolutely.[117]

As for the prosecutor's closing argument, Melendez refers to the prosecutor identifying eighteen separate "untruths" that Melendez committed in his 911 call and his interview with the police.[118]  He also cites the prosecutor's references to his "story" and his "selective memory."[119]  Defense counsel did not make a contemporaneous objection, but in moving for a mistrial after the jury retired to deliberate, Coffee argued that the prosecution had "effectively call[ed] Mr. Melendez a liar" in the rebuttal portion of its closing argument.[120]

To prevail on a claim of prosecutorial misconduct in a habeas action, a petitioner must show that the comments "'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"[121]  A challenged statement by the prosecutor must be evaluated in the context of the entire trial, as well as the context in which it was made.[122]  And, even if a prosecutor's conduct amounts to constitutional error, habeas relief will be granted only if petitioner can establish that the alleged error "'had a substantial and injurious effect or influence in determining the jury's verdict.'"[123]

On direct appeal, the Nevada Supreme Court addressed Melendez's claims of prosecutorial misconduct by explaining that the court must determine, first, whether the

---

[117] *Id.* (quoting ECF No. 20 at 68–69).

[118] *Id.* at 23 (citing to ECF No. 20 at 160–70).

[119] *Id.* (citing to ECF No. 20 at 169, 171, 176).

[120] ECF No. 20 at 177–78.

[121] *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *Greer v. Miller*, 483 U.S. 756, 765 (1987).

[122] *See Boyde v. California*, 494 U.S. 370, 384–85 (1990).

[123] *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993); *see also Johnson v. Sublett*, 63 F.3d 926, 930 (9th Cir. 1995) (no prejudice from prosecutorial misconduct because it could not have had a substantial impact on the verdict under *Brecht*).

"prosecutor's conduct was improper," then, if it was, "whether the improper conduct warrants reversal."[124]  As to Melendez's claim that the State called him a liar and elicited improper testimony from Popp, the state supreme court found that Melendez's untruths were fair game:

> As part of Melendez's closing argument, he sought to comment on why the circumstantial evidence pointing to an intentional shooting was equally consistent with his claim that the shooting had been accidental.  Then, in its rebuttal, the State sought to show that Melendez was only now claiming that the shooting was accidental because he had backed himself into such a theory of defense.  The State's method for doing so was to proceed chronologically through Melendez's 911 call and his custodial interview with Detective Popp, identifying along the way all the "untruth[s]" that Melendez had told.  On appeal, Melendez contends that pointing out these "untruth[s]" was akin to calling him a liar, which amounted to prosecutorial misconduct.  We disagree.
>
> The State's purpose behind identifying Melendez's untruths was not to brand him as a liar, but to put Melendez's claim of an accidental shooting into the appropriate context.  Because Melendez made numerous irreconcilable statements in his 911 call and in his custodial interview, the necessary implication was that at least some of those statements were untruthful.  *Cf. Miller*, 121 Nev. at 100, 110 P.3d at 59 ("[O]ther jurisdictions have held that unflattering characterizations of a defendant will not provoke a reversal when such descriptions are supported by the evidence." (quotations omitted)).
>
> Moreover, because much of the evidence regarding Melendez's intent was based upon the credibility of his and other witnesses' statements, the State necessarily had to explain why his interview statements were untrue in order to prove its case.  *See Rowland*, 118 Nev. at 39, 39 P.3d at 119 ("[W]hen a case involves numerous material witnesses and the outcome depends on which witnesses are telling the truth, reasonable latitude should be given to the prosecutor to argue the credibility of the witness—even if this means occasionally stating in argument that a witness is lying.").  Consequently, the State did not commit prosecutorial misconduct by identifying Melendez's untruths.[4]

---

[124] *Melendez*, 2011 WL 3298525, at *4 (citing *Valdez v. State*, 196 P.3d 465, 476 (Nev. 2008)) (internal quotation marks omitted).

[4] Melendez also argues that the State committed prosecutorial misconduct during its direct examination of Detective Popp by asking Detective Popp if he thought Melendez was lying in his custodial interview. This argument lacks merit and misconstrues the basis for the State's question. After Melendez's custodial interview was played for the jury in which Detective Popp could be heard as telling Melendez, "[w]e believe you," the State asked Detective Popp whether he actually believed Melendez or if this was simply an interview technique to try and stay on Melendez's good side. In response, Detective Popp testified that this was simply an interview technique, and at no point did he testify that he believed Melendez was lying to him.[125]

Reviewed under § 2254(d), the state court's adjudication of the claim did not "result[] in a decision that was contrary to, or involve[] an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," nor did it "result[] in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Notwithstanding the Nevada Supreme Court's failure to cite federal law, this court must defer to the state court's decision if neither its reasoning nor result contradicts U.S. Supreme Court precedent.[126] While not permitted to express an opinion about a defendant's guilt, "a prosecutor is free to voice doubt about the veracity of a defendant's story."[127] Also, the "untruths" that the prosecutor highlighted were inferences that could be reasonably drawn from the evidence presented at trial.[128]

[125] *Id.* at *4–5.

[126] *See Early v. Packer*, 537 U.S. 3, 8 (2002).

[127] *Dubria v. Smith*, 224 F.3d 995, 1004 (9th Cir. 2000) (citing *United States v. Sarno*, 73 F.3d 1470, 1496–97 (9th Cir. 1995)).

[128] *See United States v. Molina*, 934 F.2d 1440, 1445 (9th Cir. 1991) (prosecutor's comment that defendant lied on the stand not improper because it could be considered an inference based on the evidence).

As to the prosecutor's questioning of Popp, no Supreme Court precedent speaks directly to whether it is improper for a prosecutor elicit a government agent's opinion about the veracity of a defendant's statement.  But the Ninth Circuit held in *U.S. v. Sanchez* that it was improper for the prosecutor to directly ask "a law enforcement officer his opinion regarding whether the defendant was untruthful during a police interview."[129]

Here, the prosecutor's questioning of Popp was not so explicit.  Coming after a recording of Popp's interview of Melendez had been played for the jury, the questions were arguably an attempt to clarify for the jury that Popp's "we believe you" comments during the interview were merely an interview technique, rather than Popp's actual opinion.  In any case, it was not the type of conduct that so infected the trial with unfairness that the resulting conviction was a denial of due process.  The same conclusion applies to the prosecutor's questions about selective memory.  Because these alleged instances of prosecutorial misconduct did not amount to constitutional error, Ground 2 is denied.

**Certificate of Appealability**

The right to appeal from the district court's denial of a federal habeas petition requires a certificate of appealability.  To obtain that certificate, the petitioner must make a "substantial showing of the denial of a constitutional right."[130]  "Where a district court has rejected the constitutional claims on the merits," that showing "is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."[131]  For procedural rulings, a COA will issue only if reasonable

---

[129] *United States v. Sanchez*, 176 F.3d 1214, 1220-21 (9th Cir.1999).

[130] 28 U.S.C. § 2253(c).

[131] *Slack v. McDaniel*, 529 U.S. 473, 484 (2000); *see also James v. Giles*, 221 F.3d 1074, 1077–79 (9th Cir. 2000).

jurists could debate (1) whether the petition states a valid claim of the denial of a constitutional right and (2) whether the court's procedural ruling was correct.[132]  The court declines to issue a certificate of appealability for its resolution of any procedural issues or any of Melendez's habeas claims.

## CONCLUSION

IT IS THEREFORE ORDERED that petitioner's amended petition for writ of habeas corpus **[ECF No. 18] is DENIED**.  The Clerk of Court is directed to ENTER JUDGMENT accordingly and CLOSE THIS CASE.

**A certificate of appealability is denied.**

Dated: September 23, 2019

_____
U.S. District Judge, Jennifer A. Dorsey

---

[132] *Id.*